[L.A. No. 31243. Aug. 18, 1980.]

SIMPLICITY PATTERN COMPANY, INC.,
Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

COUNSEL

Sheppard, Mullin, Richter & Hampton and Robert Joe Hull for Plaintiff and Appellant.

Stephen N. Hollman, Kadison, Pfaelzer, Woodard, Quinn & Rossi, Richard S. Cohen, Donovan, Leisure, Newton & Irvine, John Cooley Baity, Irell & Manella, Edward G. Victor, Kenneth I. Sidle and C. Kevin McGeehan as Amici Curiae on behalf of Plaintiff and Appellant.

George Deukmejian, Attorney General, Arthur C. de Goede, Assistant Attorney General, Philip C. Griffin, Lawrence K. Keethe and Richard E. Nielsen, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**NEWMAN, J.**—Plaintiff Simplicity Pattern Company appeals from a judgment in favor of defendant Board of Equalization. The judgment denies a refund of sales tax on the transfer of film negatives and master recordings used to make audiovisual materials that help train nurses, paramedics, and other medical personnel. The transfer was part of a sale by plaintiff of the segment of its business devoted to producing and marketing such materials, consummated in 1971 through an exchange of the assets and name of its wholly owned subsidiary, Trainex Corporation, for common stock of (but less than a controlling interest in) Medcom, Inc., the transferee's parent. Trainex dissolved after the exchange, and plaintiff assumed its liabilities.

Plaintiff contends that the sale of negatives and recordings was not taxable because it (1) was not a sale of tangible personal property, (2) was a sale for resale, and (3) should escape tax by reason of its resemblance to a statutory merger. Trial was based on stipulated facts, with exhibits; there was no other evidence. Defendant assessed sales tax on these items carried as inventory accounts on the transferor's books:

"Films and Records

"Negative costs [$814,688],
   less amortization [$418,780]            $395,908

"In Process of Development                $227,750"

The components of those items apparently include all costs of materials and services for "preparation of master film strip negative, master and tape and printing proofs" but not the additional cost of making copies for retail sale.[1] The stipulation notes that under the agreement "Old Trainex [the transferor] assumed liability for any sales or other taxes payable by reason of the transfer of the assets of Old Trainex, and it was agreed that, for such purpose, the assets of Old Trainex would be valued as shown on the books of Old Trainex less book depreciation."

---

[1]The stipulation sets out these components:

"*Completed Programs*

| | | |
|---|---|---|
| "Direct Charges | | $196,893 |
| "Salaries | | 488,051 |
| "Indirect | | 129,744 |
| | Total | 814,688 |
| "Less Amortization | | 418,780 |
| "Unamortized Costs | | $395,908 |

"*In Process*

| | | |
|---|---|---|
| "Direct Charges | | $ 49,307 |
| "Salaries | | 136,894 |
| "Indirect | | 41,549 |
| | Total in Process | $227,750 |

"These components included the following elements:

*Direct Charges.*

"Costs of research material required; costs of raw film, tape and other supplies used in the actual preparation of a package; costs of outside technical consultants, research, models, art work, narration and similar services used in the actual preparation of a package; costs of preparation of master film strip negative, master and tape and printing proofs.

Plaintiff paid and then claimed a refund of $34,900.04 in taxes and interest, and on denial of its claim commenced this action (see Rev. & Tax. Code, § 6932 et seq.). (All section references are to the Revenue and Taxation Code unless otherwise indicated.)

The standard of review here is set forth in *Culligan Water Conditioning* v. *State Bd. of Equalization* (1976) 17 Cal.3d 86 [130 Cal.Rptr. 321, 550 P.2d 593], where this court stated: "The Board contends that the assessment, grounded on what it denominates an administrative classification, may be overturned only if such classification was arbitrary, capricious or without rational basis. However, it is clear from the record that the basis of the assessment was not embodied in any formal regulation or even interpretative ruling covering the water conditioning industry as a whole...but rather that the basis of the assessment was nothing more than the Board auditor's interpretation of two existing regulations.... [O]ur present task is to determine whether the Board in making the assessment in controversy has properly interpreted the relevant sections of the Sales and Use Tax Law and the Board's own relevant regulations adopted pursuant to such law. We recently summarized our proper function thusly: 'The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law [citations], and while an administrative agency's interpretation of its own regulation obviously deserves great weight [citations], the ultimate resolution of such legal questions rests with the courts. [Citations.]' (*Carmona* v. *Division of Industrial Safety, supra*, 13 Cal.3d 303, 310....) Therefore, giving the appropriate weight to the Board's interpretation, we must decide whether the receipts from plaintiff's customers...are taxable rentals for leases of tangible personal property within the meaning of the applicable provisions of the Sales and Use Tax Law and regulations promulgated thereunder." (17 Cal.3d at pp. 92-93; fn. omitted. See too *International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923, 931, fn. 7 [163 Cal. Rptr. 782, 609 P.2d 1].)

"*Salaries.*

"Employee salary cost of the Company's entire Production Department, consisting of researchers, writers, photographers, artists and other creative personnel, together with Production Department supervisors. Allocation is made by actual time spent on a particular package by creative personnel, with supervisory salaries allocated generally.

"*Indirect Charges.*

"Production Department's general office supplies and equipment repair; Production Department's telephone expense; Production Department's proportionate share of rent, heat, taxes, management, legal and other general overhead expenses."

## TANGIBLE PERSONAL PROPERTY?

California imposes a sales tax on "the privilege of selling tangible personal property at retail." (§ 6051.) "'Tangible personal property' means personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.)

■ Plaintiff contends its film negatives and master recordings were not tangible because the purchaser's primary interest was not in the physical objects but rather in the right to exploit the intellectual products they embodied. Intellectual property has been called an "intangible incorporeal right" existing separately from the physical medium that embodies it. (*Italiani* v. *Metro-Goldwyn-Mayer Corp.* (1941) 45 Cal. App.2d 464, 466 [114 P.2d 370] (statute of limitations for injury to goods inapplicable to plagiarism suit).)

Might the negatives and recordings here be deemed only partially tangible for purposes of the tax? ■ Generally, physical objects valued in part for their intellectual content may be taxed as tangible personal property on their total worth. (*Michael Todd Co.* v. *County of Los Angeles* (1962) 57 Cal.2d 684 [21 Cal.Rptr. 604, 371 P.2d 340] (assessment of movie film negatives as "tangible personal property" may include copyright value); *Roehm* v. *County of Orange* (1948) 32 Cal.2d 280, 285 [196 P.2d 550] (property tax); *Western Title Guaranty Co.* v. *County of Stanislaus* (1974) 41 Cal.App.3d 733 [116 Cal.Rptr. 351] (property tax); see too cases holding negatives and master tapes to be tangible property for investment tax credit: *Texas Instruments Inc.* v. *United States* (5th Cir. 1977) 551 F.2d 599, 608; *Walt Disney Productions* v. *United States* (9th Cir. 1976) 549 F.2d 576.)

Accordingly, if plaintiff's films and recordings were tangible property the tax on their transfer was measurable by what plaintiff received for them as a whole, without deduction for amounts paid for their intellectual or other intangible components. Sales tax is measured by a percentage of seller's gross receipts (§ 6051) except for deductions expressly authorized. (See §§ 6011 and 6012, defining "sales price" and "gross receipts.") Illustratively, section 6362.5 (enacted after the transaction now before us) limits tax on sales of master sound tapes or records to amounts the customer pays for "tangible elements" exclusive of "copyrightable, artistic or intangible elements." Other laws similarly

exclude intangible elements of value from property tax assessment. (§ 986 (art work held by artist); § 988 (motion picture; nullifying effect of *Michael Todd, supra*, 57 Cal.2d 684); §§ 995-995.2 (computer programs).) The creation of those specific exceptions seems to confirm the general rule of includability of all value components. (*Culligan, supra,* 17 Cal.3d at p. 97;[2] and see the board's regulation 1501: "When a transaction is regarded as a sale of tangible personal property, tax applies to the gross receipts from the furnishing thereof, without any deduction on account of the work, labor, skill, thought, time spent, or other expense of producing the property." (Cal. Admin. Code, tit. 18, ch. 2, § 1501.[3]) See too regulation 1502, subdivision (f)(1) (tax on sale on tangible property incorporating computer program applies to entire amount charged, including license fees and royalties); *Thys* v. *State* (1948) 31 Wn.2d 739 [199 P.2d 68] (annual royalties payable to purchasers of hop-picking machines included in the taxable selling price).)

Was the present sale one of tangible property? Distinct issues are involved in the questioned status of (1) completed films and records, carried on the transferor's books as "[n]egative costs less amortization," and (2) films and records in "process of development."

Plaintiff contends that to transfer completed negatives and recordings is not to sell tangible property when the transfer's "true object" is their intellectual rather than their physical substance, citing *Albers* v. *State Board of Equalization* (1965) 237 Cal.App.2d 494 [47 Cal.Rptr. 69]. *Albers* held the sale of a draftsman's drawing of construction plans taxable because the true object of the transaction was the drawing itself rather than architectural or engineering services that, if rendered by the transferor, might have made the drawing merely incidental. That true object concept appears in regulation 1501: "The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the con-

---

[2]The statute enacting section 6362.5 includes this statement: "The provisions of this act are not intended by the Legislature to support any inference about the meaning of the law prior to the operative date of this act." (Stats. 1975, ch. 1116, § 2.) That declaration does not preclude judicial inference based on the statute's setting up a limited exception to a general rule.

[3]All reference to regulations are to sections of title 18.

tract is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred."

*Culligan, supra,* 17 Cal.3d 86, 96, construed that regulation to require imposition of sales tax on the lease of water-conditioning exchange units,[4] on the ground that the true object was "the furnishing of the exchange unit which, by itself and without requiring any performance of human labor, softens the water" and that the service of regenerating and installing the unit was incidental. On the other hand, as an example of property transfers that are nontaxable because the property is incident to a service, regulation 1501 states that "a firm which performs business advisory, record keeping, payroll and tax services for small businesses and furnishes forms, binders, and other property to its clients as an incident to the rendition of its services is the consumer and not the retailer of such tangible personal property. The true object of the contract between the firm and its client is the performance of a service and not the furnishing of tangible personal property."

The sale of completed films and recordings here was not incidental to any services of the transferor but was part of a simultaneous transfer of virtually all the assets of a going business. Nonetheless plaintiff argues that regulation 1501 exempts not only transfers incidental to services but also transfers of tangible objects for a primary purpose of supplying their intangible content rather than the objects themselves. Plaintiff relies on these immediately ensuing words of the regulation: "Similarly, an idea may be expressed in the form of tangible personal property and that property may be transferred for a consideration from one person to another; however, the person transferring the property may still be regarded as the consumer of the property. Thus, the transfer to a publisher of an original manuscript by the author thereof for the purpose of publication is not subject to taxation. The author is the consumer of the paper on which he has recorded the text of his creation. However, the tax would apply to the sale of mere copies of an author's works or the sale of manuscripts written by other authors where the manuscript itself is of particular value as an item of tangible personal property and the purchaser's primary interest is in the physical property. Tax would also apply to the sale of artistic expressions in the form of paintings and sculptures even though the work of art may ex-

---

[4]Section 6006, subdivision (g) treats certain leases of tangible personal property as taxable sales.

press an original idea since the purchaser desires the tangible object itself; that is, since the true object of the contract is the work of art in its physical form."

The provision in that excerpt for nontaxability of the transfer of a manuscript from author to publisher does not seem to fit the regulation's category of a "transfer of tangible personal property incidental to the performance of a service." There is no indication that the author is to render anything of value apart from the manuscript itself. Yet by no means does the regulation support plaintiff's broad theory that a sale becomes nontaxable whenever its principal purpose is to transfer the intangible content of the physical object being sold. The regulation declares taxable a "sale of mere copies of an author's works" even though books, pamphlets, etc. normally are purchased for the author's ideas rather than for their physical components. (On taxation of book sales see reg. 1590, implementing the statute that exempts sales of newspapers and periodicals issued at least quarterly (§ 6362).)

The regulation's manuscript example is distinguishable from the sale here because a manuscript is used solely for its intellectual content. In contrast, the parties here stipulated plaintiff's subsidiary "was engaged in the business of producing audiovisual education aids...consisting of film strips and records...produced, filmed and recorded by conventional means," and that "copies were made for sale...from the 'negative' or 'master' production versions." Thus the film negatives and master recordings are analogous to printing plates, whereas a manuscript furnishes only verbal guidance to editors and typesetters.[5]

Plaintiff contends also that exemption of its sale was required by regulation 1529, which deals with tax consequences of movie producers' transactions.[6] Plaintiff particularly relies on (1) the provisions in subdi-

---

[5]Printing plates are subject to section 6010.3, which provides: "'Sale' and 'purchase,' for the purposes of this part, do not include (a) the fabrication or transfer by a typographer of composed type or reproduction proofs thereof for use in the preparation of printed matter, or (b) the fabrication or transfer of such reproduction proofs or impressed mats when the fabrication is for, and the transfer is to, a printer or publisher for use in printing.

"The foregoing provisions shall not apply to the fabrication or transfer of a 'pasteup,' 'mechanical' or 'assembly' of which a reproduction proof is a component part." (See too reg. 1541.)

[6]The regulation provides in pertinent part: "1529. Motion Pictures. (a) General. Producers of motion picture productions are consumers of all film and other tangible

vision (a) that movie producers "are consumers of all film and other tangible personal property used in production" and the tax does not apply to amounts the producers receive for exhibition and reproduction rights, and (2) the provision in subdivision (c)(1)(C) that "[t]he outright transfer of a motion picture production by the producer, including the negative, the print, and all rights connected with the picture, prior to the release date, is not a sale for sales and use tax purposes...."

---

personal property used in production, and tax applies to sales to producers of such property. Tax does not apply to amounts received by the producer for the right to exhibit or reproduce motion picture productions.

"(b) Definitions.

"(1) 'Production'. 'Production' means a motion picture prepared for showing on screens or through television for theatrical, commercial, advertising or educational purposes. The motion picture may be on film or video tape and have live, or animated, or a combination of live and animated action. Herein, the word 'film' includes video tape where appropriate. The motion picture may tell a story, explain, describe, promote, or announce an idea, project, program, process, product, or event. But in order for a motion picture to constitute a production, it must be entirely on motion picture film, have continuity and direction, and be complete in itself, as distinguished from 'trailer' or 'stock' shots.

"   .    .    .    .    .    .    .    .    .    .    .    .    .

"(c) Application of Tax.

"(1) Status of Producer.

"(A) Generally. A producer, including a subproducer or coproducer, is a consumer of tangible personal property used in making a production and tax applies to all sales of such property to him, inclusive of charges for fabricating or processing. No tax liability arises from fabricating or processing performed by the producer for his own account, using his own employees. Similarly, no tax liability arises from fabricating or processing performed by a subproducer or coproducer with respect to the production.

"(B) Prints. The first answer print, and release prints specified in the original contract between the producer and a sponsor, as a firm order, are part of the production and the producer is the consumer thereof. Release prints made for the sponsor as a result of orders pursuant to a mere offer in the original contract to furnish additional prints are not part of the production and the producer is the retailer of such prints. After a production contract has been completed, the sponsor may request the producer to supply him with additional prints, or may permit the producer to sell prints to others. In such cases, the producer is the retailer of the prints.

"(C) Transfer of Motion Pictures. The outright transfer of a motion picture production by the producer, including the negative, the print, and all rights connected with the picture, prior to the release date, is not a sale for sales and use tax purposes, whether or not the picture was produced for a sponsor.

"   .    .    .    .    .    .    .    .    .    .    .    .    .

"(d) Incomplete Productions. Receipts from sales of incomplete productions are subject to tax. The seller is a fabricator-retailer in such instances. Purchases of manufacturing aids used in making incomplete productions are generally subject to tax. To support exemption the fabricator-retailer must keep complete records to show that title to manufacturing aids passed to the customer prior to use by the fabricator-retailer and that items purchased were separately itemized on billings to customers. The sale to out-of-state customers of manufacturing aids located in this state and used here following the sale is not exempt as a sale in interstate commerce.

Concededly the negatives and recordings here were not on motion picture film or video tape and so were not productions under the regulation (see subd. (b)(1)). Moreover, subdivision (e) provides that a manufacturer of "film strips" for customers is "a retailer rather than a consumer"—in contrast to movie producers, who are "consumers of all film and other tangible personal property used in production" (subd. (a)).

The provision of subdivision (a) that the tax does not apply to amounts received for motion picture exhibition or reproduction rights must be considered in connection with the express exemption from sales tax of motion picture film rentals. (§ 6006, subd. (g)(1);[7] reg. 1529 (e)(3).) Subdivision (a) makes clear that (1) a transfer of exhibition or reproduction rights in the abstract is not taxable because the rights are not tangible, and (2) the granting of such rights in connection with a nontaxable lease of a film does not make the transaction taxable.

Finally, subdivision (c)(1)(C)'s provision for nontaxability of a producer's outright transfer of a motion picture "prior to the release date" applies on its face only to narrow circumstances not present here, even by analogy. First, subdivision (d) provides that sales of *incomplete* productions are subject to tax. Second, subdivision (c)(1)(C)'s limitation to transfers "prior to the release date" implies that transfers after the release date remain taxable. Here the transferor's accounting figures on which the tax was assessed included a deduction for "amortization"

---

"If an animation studio merely makes a segment of a production, either as a subcontractor or independent contractor, the studio will be the retailer of the segment so made and tax will apply to charges therefor.

"Any person must be ready to substantiate a claim that a film produced by him is a production rather than an incomplete production.

"(e) Miscellaneous.

"(1) Slide Films and Film Strips. A person who makes slide films or film strips for customers as a retailer rather than a consumer, and tax applies to charges made to customers.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    "

"(3) Distribution of Motion Pictures. Rental receipts from motion picture films and video tapes including television films and video tapes are not subject to tax, whether or not the films or tapes are productions complete in themselves.

"    .    .    .    .    .    .    .    .    .    .    .    .    ."

[7]Section 6006 provides: "'Sale' means and includes:

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(g) Any lease of tangible personal property . . . for a consideration, except a lease of:

"(1) Motion picture, including television, films and tapes.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    "

amounting to over half the original production costs, indicating that copies of at least some of the audiovisual programs had been sold to customers. (See fn. 2, *ante.*) Thus even if plaintiff might claim a refund on the ground, based on an analogy to subdivision (c)(1)(C), that some films and recordings had been transferred after completion but "prior to the release date," that claim on the present record would fail for lack of proof.

■ Plaintiff argues that, even though the regulations do not exempt transfers of film strip negatives and master recordings, the lack of an exemption is unconstitutionally discriminatory in light of the exemptions of sales of authors' manuscripts to publishers and of completed motion pictures prior to release. It is conceded, however, that the board has wide discretion to promulgate regulations classifying types of properties for tax treatment, provided that "the rule works uniformly upon all persons in a class and the classification is based upon some natural or reasonable distinction." (*Gen. Elec. Co. v. State Bd. of Equalization* (1952) 111 Cal.App.2d 180, 188 [244 P.2d 427]. Accord, *Fox etc. Corp. v. City of Bakersfield* (1950) 36 Cal.2d 136, 141-144 [222 P.2d 879]; *Henry's Restaurants of Pomona, Inc. v. State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1016 [106 Cal.Rptr. 867].)

Plaintiff does not contend that the exemptions are unauthorized by statute, and in this litigation it would not have standing to do so. If there is a reasonable basis for taxing the present sale even while granting those exemptions, plaintiff cannot complain of discrimination. As to manuscripts, that basis may be found in differences between (1) a document valued solely as an expression of the author's thoughts, and (2) master films or recordings which, though having intellectual content, are physically useful in making finished products. As to motion pictures, a distinction may reasonably be based on the economic differences between movie-making for mass entertainment and preparing audiovisual aids for specialized instruction.

■ We conclude that the completed film negatives and master recordings were tangible personal property for sales tax purposes. Though valued in part for their intellectual content, they also were physically useful in the manufacturing process. Their value as physical objects permitted measuring the tax on their sale by the price received for their entire worth. Finally, the present transfer was not incidental to any service and so was a sale of property for tax purposes.

There remains the question whether the uncompleted film negatives and master recordings—shown on the transferor's books as in "process of development"—were tangible personal property under sections 6016 and 6051. The record does not show the form in which the incomplete work was transferred, and no basis is proposed for treating its transfer differently from that of the completed films and recordings. Regulation 1529, subdivision (d) (fn. 6, *ante*) declares that sales of incomplete motion picture productions are taxable, making no distinction for intangible components. In the absence of contrary factual showing, we deem the transfer of films and recordings in process of development to be one of tangible personal property.

## SALE FOR RESALE?

Section 6007 provides: "A 'retail sale' or 'sale at retail' means a sale *for any purpose other than resale* in the regular course of business in the form of tangible personal property. . . ." (Italics added.)

Plaintiff's contention that the transfer of the negatives and recordings was for the purpose of resale is based on the transferor's accounting treatment from which defendant calculated the tax. They were carried on the books as inventory accounts consisting of all production costs amortized over the periods in which they were expected to produce revenue. Plaintiff asserts that under accepted movie industry practice the unamortized costs were regarded as "current assets," defined in 1969 by the Accounting Principles Board of the American Institute of Certified Public Accountants as assets "reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business." Therefore, argues plaintiff, they constituted goods in process or stock in trade; and their transfer in the present transaction was for the purpose of resale.

Sales tax law, however, does not treat all properties consumed, disposed of, or made obsolete in the business operating cycle as goods held for resale, even though accounting principles might call for their treatment as current assets or even as inventory. Regulation 1525 provides: "1525. Property Use in Manufacturing—General Rules. (a) Tax applies to the sale of tangible personal property to persons who purchase it for the purpose of use in manufacturing, producing or processing tangible personal property and not for the purpose of physically incorporating it into the manufactured article to be sold. Examples of such property are

machinery, tools, furniture, office equipment, and chemicals used as catalysts or otherwise to produce a chemical or physical reaction such as the production of heat or the removal of impurities.

"(b) Tax does not apply to sales of tangible personal property to persons who purchase it for the purpose of incorporating it into the manufactured article to be sold, as, for example, any raw material becoming an ingredient or component part of the manufactured article." We recently applied that regulation in *Kaiser Steel Corp.* v. *State Board of Equalization* (1979) 24 Cal.3d 188 [154 Cal.Rptr. 919, 593 P.2d 864], holding that the sale of materials designed to remove impurities during the manufacture of steel was for a purpose other than resale even when, after being used, the materials were resold as slag. Materials such as catalysts or molds may be used and perhaps consumed in a manufacturing process, but their purchase is not exempted as being for resale because it is not for the purpose of incorporating the material into the manufactured article to be sold.

There is no showing that the transfer here includes any property that was to be incorporated physically into the audiovisual aids sold to the transferor's customers. The parties' stipulation indicates that the price paid for the property was for "preparation of master film strip negative, master and tape and printing *proofs*" and that "*copies* were made for sale to hospitals and other customers *from* the 'negative' or 'master' production versions." (Italics added.)

*Kaiser Steel, supra,* 24 Cal.3d at page 192, notes that, "[i]n determining whether a sale is taxable as a retail sale or exempt as a sale for resale, the California courts have consistently looked to the primary intent of the purchaser or primary purpose of the purchase." Since the primary purpose of selling the film negatives and master recordings was to use them in manufacturing the final product rather than to incorporate it into that product, their sale did not escape tax as one for resale.

### QUASI-MERGER?

Plaintiff contends that (1) the sale of its subsidiary's business to Medcom's subsidiary could have been effected by statutory merger, (2) sales tax would not have applied to such a transaction, and (3) the sale thus should be free of tax because it had the same end result. To demonstrate the merger's tax-free nature plaintiff invokes regulation 1595,

subdivision (b)(3), which provides: "Tax does not apply to a transfer of property of a constituent corporation to a surviving corporation or new corporation pursuant to a statutory merger under sections 1100-1305 of the California Corporation Code or similar laws of other states." The regulation is based on section 6367, which exempts "occasional sales" and section 6006.5, subdivision (b), which includes as an occasional sale a "transfer of all or substantially all the property held or used...[in certain business activities] when after such transfer the real or ultimate ownership of such property is substantially similar to that which existed before such transfer."

■ We assume for present purposes that the transaction could have been cast in a form that would have called for exchanges of stock, not subject to sales tax, permitting Medcom's subsidiary to acquire the property of plaintiff's subsidiary through "a transfer of property of a constituent corporation to a surviving corporation or new corporation pursuant to a statutory merger." The fact is, however, that here there was a different arrangement whereby plaintiff's subsidiary made a taxable sale of tangible personal property. It is perhaps an inevitable, but neither unique nor unconstitutional, consequence of applying revenue measures to sophisticated commercial arrangements that tax consequences sometimes vary according to the forms of transactions that nonetheless accomplish substantially the same results.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., Clark, J., Richardson, J., and Manuel, J., concurred.

Appellant's petition for a rehearing was denied September 17, 1980.