[No. A038555. First Dist., Div. Two. Feb. 16, 1989.]

REDWOOD EMPIRE PUBLISHING CO. et al., Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**COUNSEL**

Richard B. Weinstein, Weinstein & Weil, Paul N. Halvonik and Halvonik & Halvonik for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, and Patricia Streloff, Deputy Attorney General, for Defendant and Respondent.

## OPINION

SMITH, J.—Revenue and Taxation Code section 6362 exempts from this state's sales and use tax the gross receipts from any "newspaper" or "periodical" issued at regular intervals not exceeding three months. By administrative regulation, the State Board of Equalization (Board) has adopted a definition of newspapers and periodicals which excludes publications consisting of more than 90 percent advertising. The primary issue raised on this appeal is whether the classification created by this regulation constitutes an impermissible infringement on First Amendment liberties or a denial of equal protection as to publications which are devoted entirely, or almost entirely, to advertising. We hold that it does not.

### BACKGROUND

Plaintiff-appellant Redwood Empire Publishing Co. (Redwood) is the publisher of a shopping guide called the Tri-City Weekly (the Weekly) which is distributed without charge in Humboldt County. It is conceded that more than 90 percent of the Weekly's entire printed area consists of advertising. The other appellants, Paradise Post, Hadley Newspapers, Inc. and Sparks Printing handled the printing of the Weekly during the time period in question. Each of the printers collected sales tax on the printing charges from Redwood and remitted them to the Board. Subsequently, appellants filed claims with the Board for a refund of $43,736.40 in such taxes, on grounds that the Weekly qualified as a "newspaper or periodical" under section 6362 of the Revenue and Taxation Code and that section 1590 of title 18 of the Administrative Code[1] (hereafter regulation 1590), which denies the exemption to publications devoted primarily to advertising, was both in violation of the statute and unconstitutional. After exhausting their administrative remedies before the Board, appellants filed a complaint for a refund in San Francisco Superior Court.

---

[1] Effective January 1, 1988, the name of the "California Administrative Code" was changed to the "California Code of Regulations."

The trial court upheld the Board's denial of the refund, specifically rejecting appellants' First Amendment attack on the validity of regulation 1590. Appellants appeal from the ensuing judgment denying them relief.[2]

## APPEAL

California's Sales and Use Tax Law (Rev. & Tax. Code, § 6001 et seq.)[3] imposes a general sales and use tax on tangible personal property in this state. Chapter 4 of that legislation (§ 6351 et seq.) grants certain exemptions from the tax. Section 6362, the statute under review, confers an exemption upon regularly published newspapers and periodicals, or the components thereof.[4]

Pursuant to its legislative authority (§ 7051) the Board adopted regulation 1590, which defines a "newspaper" and "periodical" for purposes of section 6362. That definition expressly excludes "shopping guides" such as the Weekly, or any other publication, 90 percent or more of which is devoted to advertising.[5]

Appellants do not question the validity of the exemption granted by section 6362—on the contrary, they wish to reap the benefits of it. Their

---

[2]During trial proceedings, Redwood conceded that it is not entitled to any relief on the complaint in its present form. Consequently, future references to "appellants" are to the remaining plaintiffs in the action.

[3]Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

[4]Section 6362, subdivision (a) reads: "There are exempted from the taxes imposed by this part, the gross receipts from the sale of, and the storage, use, or other consumption in this state, of tangible personal property which becomes an ingredient or component part of any newspaper or periodical regularly issued at average intervals not exceeding three months and any such newspaper or periodical."

[5]During the time period in question, the text of title 18, California Administrative Code, section 1590 read in pertinent part, as follows: "(a) Definitions.

"(1) 'Newspaper.' The term 'newspaper' as used herein . . . is limited to those publications which are commonly understood to be newspapers and which are printed and distributed periodically at daily, weekly, or other short intervals for the dissemination of news of a general character and of a general interest. The term does not include handbills, circulars, flyers, or the like, unless distributed as part of a publication which constitutes a newspaper within the meaning of this subparagraph. . . . For purposes of this subparagraph, advertising is not considered to be news of a general character and of a general interest.

"(2) 'Periodicals.' The term 'periodical' as used herein is limited to those publications which appear at stated intervals, each issue of which contains news or information of general interest to the public, or to some particular organization or group of persons. . . . The term does not include catalogs, programs, score-cards, handbills, price lists, order forms or maps. Neither does it include shopping guides or other publications of which the advertising portion, including product publicity, exceeds 90 percent of the printed area of the entire issue in more than one-half of the issues during any 12-month period."

purpose is to defeat regulation 1590. In doing so they launch the following three-pronged attack: (1) it is an impermissible infringement on protections of freedom of speech guaranteed by the First Amendment; (2) it is a denial of equal protection; and (3) it is unauthorized by the Legislature. We address each of these arguments in turn.

I

*The First Amendment Challenge*

In interpreting the legislative intent behind section 6362, regulation 1590 draws a distinction between commercial and noncommercial publications, withholding the benefits of the tax exemption from the former and granting them to the latter.

Regulation 1590, however, antedated the United States Supreme Court decision in *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817] (*Virginia Pharmacy*), in which the court forever abandoned the notion that commercial speech is not entitled to First Amendment protection. Recognizing that "the free flow of commercial information" is indispensable in modern society (*id.,* at p. 764 [48 L.Ed.2d at p. 360]), *Virginia Pharmacy* concluded that governmental suppression of such information must be analyzed within the context of the First Amendment. (*Id.,* at p. 770 [48 L.Ed.2d at p. 363].)

The central premise of this appeal is that *Virginia Pharmacy* signaled the end of any permissible distinction between commercial and noncommercial speech in terms of governmental regulation; that since both forms of speech are of equal dignity, any differential treatment of commercial speech from noncommercial expression (such as that contained in regulation 1590) constitutes "content-based regulation," a practice which has been repeatedly condemned as repugnant to First Amendment principles. (See, e.g., *Arkansas Writers' Project, Inc.* v. *Ragland* (1987) 481 U.S. 221, 229-230 [95 L.Ed.2d 209, 219-220, 107 S.Ct. 1722] (*Ragland*); *Consolidated Edison Co.* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 538 [65 L.Ed.2d 319, 328, 100 S.Ct. 2326]; *Carey* v. *Brown* (1980) 447 U.S. 455, 462 [65 L.Ed.2d 263, 270-271, 100 S.Ct. 2286].)

However, *Virginia Pharmacy* itself cautioned against drawing the inference that commercial speech is to be considered as constitutionally equal in stature to noncommercial expression. (425 U.S. at p. 771, fn. 24 [48 L.Ed.2d at p. 364].) As the Supreme Court later explained in *Metromedia Inc.* v. *San Diego* (1981) 453 U.S. 490, 505 [69 L.Ed.2d 800, 813, 101 S.Ct. 2882],

*Virginia Pharmacy* "did not equate commercial and noncommercial speech for First Amendment purposes; indeed, it expressly indicated to the contrary. See [425 U.S.] at 770-773, and n. 24. . . ." The court went on to state that " '[t]he Constitution . . . accords a *lesser protection to commercial speech than to other constitutionally guaranteed expression.* The protection available for a particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.' " (*Metromedia, supra,* at p. 507 [69 L.Ed.2d at p. 814], quoting *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n* (1980) 447 U.S. 557, 562-563 [65 L.Ed.2d 341, 348-349, 100 S.Ct. 2343], italics added.)

The distinction drawn by the court is firmly grounded in the higher value which society places upon expression which contributes to the exchange of ideas as opposed to communication designed purely to make a profit: "We have not discarded the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. . . . To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." (*Ohralik* v. *Ohio State Bar Assn.* (1978) 436 U.S. 447, 455-456 [56 L.Ed.2d 444, 453, 98 S.Ct. 1912].)

The greater degree of judicial deference to governmental regulation of commercial speech was recently evident in *Posadas de Puerto Rico Assoc.* v. *Tourism Co.* (1986) 478 U.S. 328 [92 L.Ed.2d 266, 106 S.Ct. 2968], where the court upheld a statute banning the advertising of casino gambling (a lawful activity in Puerto Rico).

In light of the continuing judicial recognition and adherence to the distinction between commercial and other forms of expression, appellants' heavy emphasis on *Minneapolis Star* v. *Minnesota Comm'r of Rev.* (1983) 460 U.S. 575 [75 L.Ed.2d 295, 103 S.Ct. 1365] (*Minneapolis Star*), and *Ragland, supra,* 481 U.S. 221, is not convincing.

*Minneapolis Star* involved an "ink and paper" tax which singled out the entire press for a special tax burden not placed upon other enterprises; the court perceived this statute as a "means of abridging the freedom of the

press" and therefore subjected it to the strictest scrutiny. (*Minneapolis Star, supra,* 460 U.S. at pp. 579, 585-586, fn. 7 [75 L.Ed.2d at p. 305].)

In *Ragland, supra,* the tax was constructed in such a way as to target a small group of publishers based solely on the content of the ideas expressed. The tax contained "numerous statutory exemptions" including "newspapers and religious, trade, professional, and sports magazines," thereby falling only on petitioner's general interest monthly magazine, and perhaps one or two others. (481 U.S. at pp. 224, 229 [95 L.Ed.2d at pp. 219-220].) The court therefore analyzed the measure as governmentally sanctioned content discrimination, which has historically been viewed as hostile to fundamental First Amendment liberties. (*Id.,* at p. 230 [95 L.Ed.2d at p. 220].)

In our view, differential tax treatment of advertising publications does not stand on an equal footing with the type of content-based discrimination invalidated in *Ragland.* On the contrary, the distinction promulgated by regulation 1590 is not content-discriminatory, it is "content-neutral." It is based on the form of communication (advertising) as opposed to its content. Moreover, it is a reflection of the common sense need to distinguish commercial from noncommercial speech which has been repeatedly articulated by the Supreme Court.

In sum, the weakness of appellants' argument is in assuming that the mere fact that commercial speech is deserving of *some* First Amendment protection means that the state is prevented from treating it differently than noncommercial speech. That assumption is unsupportable.

## II

### *Equal Protection*

■■■ Appellants' second argument is that by treating commercial expression differently, the challenged regulation is a denial of equal protection under the Fourteenth Amendment. ■■ ■■■■ Appellants claim that in according less favored tax status to the Weekly than to other newspapers, the Board has created a suspect classification which cannot be supported merely by the state's interest in raising revenue.[6]

---

[6]The Board argues and the trial court ruled that appellants waived this argument because they did not formally argue an equal protection claim in administrative proceedings before the Board. (See *Jimmy Swaggart Ministries* v. *State Bd. of Equalization* (1988) 204 Cal.App.3d 1269, 1290-1291 [250 Cal.Rptr. 891].) We note, however, that appellants did raise Fourteenth Amendment issues by asserting that the regulation "is unconstitutional as an arbitrary regulation denying due process." Furthermore, because equal protection consid-

This contention is also without merit. It is important to note that regulation 1590 does not restrict or regulate in any manner appellants' right to engage in commercial speech; it merely withholds from them a tax subsidy. As long as it is not aimed primarily at suppression of speech, a legislative decision not to subsidize particular First Amendment activity does not infringe upon that activity and therefore does not subject the classification to strict scrutiny analysis. (*Regan* v. *Taxation With Representation of Wash.* (1983) 461 U.S. 540, 544 [76 L.Ed.2d 129, 135-136, 103 S.Ct. 1997] (*Regan*); *Cammarano* v. *United States* (1959) 358 U.S. 498 [3 L.Ed.2d 462, 79 S.Ct. 524]; *Times Mirror Co.* v. *City of Los Angeles* (1987) 192 Cal.App.3d 170, 185 [237 Cal.Rptr. 346], app. dism. (1988) 482 U.S. 1022 [98 L.Ed.2d 756, 108 S.Ct. 743] (*Times Mirror*).

In *Regan, supra,* the United States Supreme Court upheld the denial of a tax exemption to a nonprofit organization, a substantial part of whose activities were devoted to lobbying, even though the same exemption was granted to lobbying veteran groups. (461 U.S. at pp. 550-551 [76 L.Ed.2d at pp. 139-140].) In holding that "[b]oth tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system" (*id.* at p. 544 [76 L.Ed.2d at p. 136]), the court declared that in choosing to withhold a tax exemption for plaintiff organization "Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for TWR's lobbying. We again reject the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.' " (*Id.,* at p. 546 [76 L.Ed.2d at p. 137], citing *Cammarano, supra,* 358 U.S. at p. 515 [3 L.Ed.2d at p. 473], (Douglas, J., conc.).)

*Regan*'s reasoning was followed by the recent California appellate decision in *Times Mirror Co., supra,* 192 Cal.App.3d 170. In upholding against constitutional attack a city business tax which levied taxes on the gross receipts from different businesses in the communications industry at vastly disparate rates, the court rejected the proposition that the city was compelled to accord uniform tax treatment to all First Amendment related activities. " 'No constitutional rights are violated if the burden of the license tax falls equally upon all members of a class, though other classes have lighter burdens or are wholly exempt, provided that the classification is reasonable, based on substantial differences between the pursuits separately grouped, and is not arbitrary.' " (*Id.,* at p. 183.)

erations are always raised in classifications touching upon First Amendment rights (*Ragland, supra,* 481 US. at pp. 227-228, fn. 3 [95 L.Ed.2d at p. 218]), we conclude that the argument has been properly preserved for appeal.

The tax regulation here is not aimed at suppressing certain subjects of speech, but turns upon the naturally occurring distinction between advertising publications and news and interest publications. Granting a tax benefit to the latter but not the former does not constitute discrimination of First Amendment magnitude. "If the state subsidizes some First Amendment activity but not all, no suspect classification is created. Conversely, the failure 'to subsidize the exercise of a fundamental right does not infringe [that] right.' (*Regan* v. *Taxation With Representation of Wash., supra,* 461 U.S. 540, 549.) [¶] . . . In other words, the classification within the ordinance does not violate equal protection 'if the distinction rests upon a rational basis, and it must be presumed to rest on that basis if there is any conceivable state of facts which would support it.' (*City of San Jose* v. *Donohue* (1975) 51 Cal.App.3d 40, 45 [123 Cal.Rptr. 804].)" (*Times Mirror, supra,* 192 Cal.App.3d at p. 185; see also *Kohan* v. *Cohan* (1988) 204 Cal.App.3d 915, 923 [251 Cal.Rptr. 570].)

■ A rational basis for the distinction drawn in regulation 1590 is readily discernible. In enacting the exemption for newspapers and periodicals regularly issued, the Legislature sought to subsidize and thereby encourage publications which disseminate valuable and timely news and information. The Board could rationally conclude that publications which are mere conduits for advertising do not fit within the objective sought to be achieved by section 6362, and therefore are not the proper beneficiaries of the exemption. Indeed, in the absence of such a classification, every catalog, handbill or junk flyer issued at periodic intervals would enjoy the same tax advantage as publications which contribute to the marketplace of ideas.

■ We conclude that the classification established by regulation 1590 must be analyzed not under strict scrutiny standards, but under the rational basis test; that the differential tax treatment accorded commercial publications is not arbitrary or irrational; and that the regulation therefore does not deny appellants equal protection of the law.

III

*Authority of the Board to Adopt Regulation 1590*

■ Appellants lastly claim that regulation 1590 is invalid because it is in excess of the Board's authority. They note that section 6362 does not distinguish between publications which are devoted to advertising and those that are not. In the absence of an express legislative directive, appellants argue,

any regulation drawing such a distinction is void because First Amendment liberties are implicated. We see no such infirmity in regulation 1590.

Section 7051 confers upon the Board the power to "prescribe and adopt rules and regulations" relating to the administration and enforcement of the sales and use tax law. By this grant, the Legislature has properly delegated to the Board the duty of enforcing the sales tax law and conferred upon it considerable discretion in construing the statutes. (*Ontario Community Foundations, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811, 816 [201 Cal.Rptr. 165, 678 P.2d 378].) As we recently stated, if there appears to be a reasonable basis for the Board's construction, we will not substitute our judgment for that of the Board, since "[o]ur limited scope of review is to decide whether the agency reasonably interpreted the statute, not to assess the wisdom of the regulations." (*Engs Motor Truck Co.* v. *State Bd. of Equalization* (1987) 189 Cal.App.3d 1458, 1466 [235 Cal.Rptr. 117].)

Regulation 1590 does not transgress the administrative authority of the Board. It does not arbitrarily classify newspapers and periodicals, but instead only endeavors to give substantive meaning to the terms "newspaper" and "periodical" as they are used in section 6362. Such an interpretation is necessary in order to differentiate those publications from other printed matter. In this area, the Board's exercise of discretion will not be disturbed as long as " 'the rule works uniformly upon all persons in a class and the classification is based upon some natural or reasonable distinction.' " (*Simplicity Pattern Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 900, 912 [167 Cal.Rptr. 366, 615 P.2d 555], citing *Gen. Elec. Co.* v. *State Bd. of Equalization* (1952) 111 Cal.App.2d 180, 188 [244 P.2d 427].) Using the presence of advertising as a basis for the distinction is a reasonable classification method, and in fact it is the same method which has long been used by the United States Postal Service in conferring upon periodicals second class mailing privileges. (39 C.F.R., ch. III, pt. 3001, subpart c, appen. A, §§ 200.0110, 200.0121 (July 1, 1988); see *Houghton* v. *Paine* (1904) 194 U.S. 88, 94-95 [48 L Ed 888, 889, 24 S.Ct. 590].)

Accordingly, the classification set forth in regulation 1590 is within the broad grant of interpretative power given to the Board by the Legislature. As applied to appellants, this classification is not an abuse of that power.

## DISPOSITION

Judgment affirmed.

Kline, P. J., and Benson, J., concurred.